

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-25-00065-CV

GP GROUP OF COMPANIES, LLC D/B/A GP CONSTRUCTION GROUP AND GP COMMERCIAL ROOFING, APPELLANTS

V.

ST. JOSEPH CATHOLIC PARISH AND MICHAEL F. OLSON, BISHOP OF THE CATHOLIC DIOCESE OF FORT WORTH, APPELLEES

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-355126-24, Honorable Tom Lowe, Presiding

July 7, 2025

MEMORANDUM OPINION[1]

Before QUINN, C.J., and PARKER and DOSS, JJ.

Appellants, GP Group of Companies, LLC d/b/a GP Construction Group and GP Commercial Roofing ("GP Group") appeal from the trial court's denial of their motion to set aside default judgment in favor of appellees St. Joseph Catholic Parish and Michael

---

[1] This case was transferred to this court from the Second Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. In the event of any conflict, we apply the transferor court's case law. TEX. R. APP. P. 41.3.

F. Olson, Bishop of the Catholic Diocese of Fort Worth ("St. Joseph").  Through one issue, GP Group argues the trial court erred in denying its motion because 1) its failure to timely file an answer to St. Joseph's lawsuit was not intentional or the result of conscious indifference, 2) GP Group presented sufficient arguments and proof of meritorious defenses, and 3) setting aside the default judgment would not prejudice St. Joseph.  We affirm.

### *Background*

This suit arose from a contract dispute involving roof repairs.  St. Joseph hired GP Group to repair the church's roofing system.  As part of its contract, GP Group provided to St. Joseph a five-year workmanship warranty, among other warranties.  Upon completion of the work, St. Joseph found it unsatisfactory and attempted to make a warranty claim.  GP Group allegedly ignored the requests; so, St. Joseph sued GP Group for breach of express warranties, violations of the Texas Deceptive Trade Practices Act, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, breach of implied warranty of good and workmanlike services, negligence, and breach of contract.  It also sought recovery of attorney's fees.

St. Joseph initially sent an email on July 31, 2024, directed to GP Group's owner and registered agent, Gregg Peterson.  The subject line read "St. Joseph Catholic Church of Arlington."  The email directed the reader to the attached PDF letter, entitled "2024.7.31 GP Commercial Demand Letter."  The attachment contained a notice letter, an inspection report that spanned over 50 pages, and a copy of St. Joseph's petition.  There was neither citation nor any direction to file an answer to a lawsuit.  Furthermore, the language in the notice letter included both a demand for either repairs or payment of damages and

2

reference to a lawsuit having been filed. The latter also directed attention to the petition being attached as "Exhibit 2," with the phrase "Exhibit 2" underscored in the original document. Petersen and the general manager of GP Group attested that they 1) did not realize the documents pertained to a lawsuit, 2) believed the items simply consisted of a demand notice, and 3) did not notice the petition attached to the packet.

During the first week of August 2024, citation and the petition filed by St. Joseph was formally served on Peterson. The latter, however, would ultimately attest that he did not "recall" receiving this service, did not "recall" anyone telling him GP Group had been sued, and did not realize that GP Group was served with a lawsuit.

Three days later, GP Group received a certified mail packet containing the identical information included in the July 31 email. Again, Peterson and GP Group personnel ostensibly believed the company had merely received a demand.

GP Group's general manager then forwarded the information to the company's insurance broker. Soon thereafter, a claims adjuster apparently working on behalf of GP Group contacted counsel for St. Joseph about the claim. On August 8, 2024, counsel for St. Joseph responded, which response included both the information the adjuster sought and the lawsuit. Communications between insurance personnel purportedly investigating the claim on behalf of GP Group further revealed that by September 11, 2024, or about a month before entry of default, they knew of the lawsuit having been filed. So too were they mentioning between themselves the assignment of counsel to represent GP Group.

GP Group never filed an answer to St. Joseph's lawsuit. And on August 30, 2024, St. Joseph moved for entry of a default judgment. Said motion was granted on October 10, 2024. That resulted in entry of a final default judgment dated October 15, 2024.

3

Through it, the court awarded St. Joseph $569,263.00 against GP Group. GP Group acknowledged receiving notice of the default judgment on October 15, 2024. It waited until November 11, 2024, to move for new trial setting aside the previously entered default judgment.

The trial court convened a hearing on GP Group's motion on December 16, 2024. Eleven days earlier, GP Group allegedly discovered the formal citation served during the first week of August. It was found under a pile of papers which included the earlier mailed notice of demand and suit. Ultimately, the trial court denied the motion.

### *Analysis*

Via its sole issue, GP Group contends the trial court erred in denying its motion to set aside default judgment. This is purportedly so because it presented evidence satisfying each element to obtain a new trial. We overrule the issue.

The decision to grant or deny a new trial lies within the discretion of the trial court. *In re Sandoval*, 619 S.W.3d 716, 721 (Tex. 2021). That discretion is limited, however. *Id.* That is, the trial court must grant the motion for new trial and vacate a default judgment if: 1) the defendant's failure to answer was unintentional, did not result from conscious indifference on its part, but rather was due to a mistake or an accident; 2) the defendant averred a meritorious defense within its motion; and 3) granting the motion will not delay or otherwise injure the plaintiff. *Id.* The burden to satisfy each of those three elements lies with the party seeking new trial. *Hofer Builders, Inc. v. Fireman's Fund Ins. Co.*, No. 07-15-00117-CV, 2017 Tex. App. LEXIS 1087, at *6 (Tex. App.—Amarillo Feb. 7, 2017, no pet.) (mem. op.).

4

Furthermore, when evidence creates an issue of fact regarding the first element, for instance, the matter becomes a fact question that the trial court resolves. *Kinara v. Ongera*, No. 02-22-00068-CV, 2022 Tex. App. LEXIS 8440, at *11 (Tex. App.—Fort Worth Nov. 17, 2022, no pet.) (mem. op.). That is, "the question of why the defaulted party failed to answer presents a fact question." *Id.* And, under those circumstances, the trial court, acting as the factfinder, is free to believe all, none, or part of the evidence." *Id.* Indeed, a "trial court does not abuse its discretion when it bases its decision on conflicting evidence and there is evidence in the record that reasonably supports the decision . . .[;] '[t]he trial court's choices among merely conflicting pieces of evidence cannot be an abuse of discretion.'" *Lopez v. Fluor Corp.*, No. 05-19-00970-CV, 2022 Tex. App. LEXIS 2763, at *16 (Tex. App.—Dallas Apr. 26, 2022, no pet.) (mem. op.). And, as an appellate court, we defer to the factfinder's credibility choices and choices regarding the weight to assign testimony. *Bharadwaja v. Hays*, No. 08-24-00075-CV, 2025 Tex. App. LEXIS 4293, at *21 (Tex. App.—El Paso June 19, 2025, no pet. h.) (mem. op.); *Hale v. Miller*, No. 01-19-00791-CV, 2021 Tex. App. LEXIS 5948, at *7 (Tex. App.—Houston [1st Dist.] July 27, 2021, no pet.) (mem. op.). *See also Lee v. Lee*, No. 02-18-00006-CV, 2019 Tex. App. LEXIS 5932, at *27 (Tex. App.—Fort Worth July 11, 2019, no pet.) (mem. op.) (stating appellate courts generally afford great deference to a factfinder's credibility determinations although they need not defer to credibility determinations that are unreasonable).

Regarding the first element, a defendant's failure to answer is intentional or with conscious indifference when the evidence illustrates it knew it was sued but did not care. *Kinara*, 2022 Tex. App. LEXIS 8440, at *10; *see also Milestone Operating, Inc. v.*

*ExxonMobil Corp.* 388 S.W.3d 307, 310 (Tex. 2012) (same); *Fid. & Guar. Ins. Co. v. Drewery Constr. Co.*, 186 S.W.3d 571, 575-76 (Tex. 2006) (same).  The court looks to the knowledge and acts of the defendant in assessing that topic.  *Kinara*, 2022 Tex. App. LEXIS 8440, at *10.  And, in attempting to prove the lack of intent or conscious indifference, the movant must proffer some excuse for the failure to appear, even though the excuse need not be a good one.  *Id*.  We further note that a defendant can file an answer any time before the trial court grants default judgment.  *MCJ Engines, LLC v. Kearney*, No. 01-23-00217-CV, 2024 Tex. App. LEXIS 5576, at *7 (Tex. App.—Houston [1st Dist.] Aug. 6, 2024, no pet.) (mem. op.).

*Conscious Indifference*

To reiterate, the burden lay with GP Group to prove its default was neither intentional nor consciously indifferent, but rather the result of mistake or accident.  It attempted to prove as much by suggesting it knew not of either the citation or lawsuit.  In considering the allegation, the trial court did not simply have uncontroverted evidence before it.  While nothing may controvert Peterson's allegation that he did not "recall" being served with process or citation, the same is not true of knowing about the pending lawsuit.  St. Joseph, through its legal counsel, thrice informed GP Group of the suit.  Twice was it informed via the July 31 email and the early August mailing.  Both contained a cover letter explaining St. Joseph's complaint and demand for repairs or damages.  More importantly, and immediately following the demand for repairs and damages, appeared the following:

> Please contact this firm immediately to begin discussions to resolve this dispute and make St. Joseph whole.  Because you have refused to honor your warranty and repair your defective work, St. Joseph has been forced to file the lawsuit enclosed as Exhibit 2.  St. Joseph had to take this regrettable step because of your delays in handling this issue, but it remains willing to work toward a resolution of this matter.  Be aware that if St. Joseph

6

> is forced to fully litigate this matter, St. Joseph will also seek to recover
> treble damages under the Texas Deceptive Trade Practices Act.

(underscore in original).  Reference, as of July 31, to a lawsuit having been filed due to the alleged intransience of GP Group is apparent, though the company endeavors to nominalize the revelation by casting the entire letter as a mere demand.  While the information may have been included with other data that explained the claim's nature and the willingness of the church to resolve the dispute, reference to the existing lawsuit remains clear.  And, that Peterson read both missives can be reasonably inferred from his 1) statements about interpreting same as simply demands and 2) comments about the 50-page report attached as Exhibit 1.  That is, the trial court could have reasonably deduced that interpreting the nature of a document meant Peterson had to first peruse it.  This is especially so given that Peterson did not expressly deny reading either letter.

Of further note are the somewhat morphing versions of what occurred offered by Peterson and Princena, the general manager.  For instance, both attested that no one served them with citation.  That changed once the individual who served process offered his detailed affidavit.  That, and the insistence of defense counsel, led Princena to "re-review[], page-by-page, every single page of documentation we possessed."  And, "[i]t was at this time that [Princena] discovered the citation papers I had not seen before on my desk hidden behind a notepad, . . [which] notepad was located behind the Packet of Demand documents we received via certified mail on August 5th."  In turn, Peterson subsequently attempted to explain that his initial denial about being served simply related to the time service was effectuated.  And, while he allegedly did not recall ever being served, he offered an explanation why he did not so recall.  It related to the wardrobe worn by the process server.  Rather than wearing a uniform like those serving process in

7

other cases involving GP Group, Peterson "clearly did not realize that the private process server in this case was performing the same task that uniformed officers do in serving me an actual lawsuit . . . ." That comment can lead one to wonder why Peterson would remember the wardrobe of a process server if he actually did not remember being served with process. This morphing nature of testimony, at the very least, provided the trial court fodder to question the credibility of those officers or employees testifying on behalf of GP Group.

Indeed, the trial court's utterance at the close of its December 16 hearing is telling upon the topic of credibility when it came to knowing about being served. It said: "I once heard a lawyer in trial . . . he became frustrated with the witness . . . and he finally said, look, I can read it to you, but I cannot understand it for you." We read the anecdote as the trial court intimating that though Peterson and Princena may not have understood the notice letters sent them, they nonetheless received and read them.

To that we add legal counsel expressly informing, on August 11, GP Group's insurer or insurance broker (Napoli), of the pending lawsuit. So too is there the bit of evidence revealing that insurance personnel acting on behalf of GP Group or investigating the claim discussed both 1) the fact of the pending suit and 2) the appointment of counsel several weeks before entry of default.

Simply put, the trial court had evidence upon which to conclude that GP Group knew of the lawsuit before entry of default. That very evidence, and reasonable inferences from it, provided the court basis to 1) discredit or disbelieve the representations of Peterson and Princena, 2) reject the explanation GP Group offered to justify the default, and 3) conclude that GP Group failed to carry its burden of proving the default was neither

8

intentional nor consciously indifferent. And, the trial court having evidence to do same, we cannot say it abused its discretion in denying GP Group's motion to vacate the default judgment and must affirm that decision.

Brian Quinn
Chief Justice